## HOUSTON OIL & MINERALS CORPORATION

v.

## SEEC, INC., et al.

### Civ. A. No. 83-0922 L.

United States District Court,
W.D. Louisiana,
Lafayette-Opelousas Division.

May 30, 1985.

On Motions for Rehearing and
Reconsideration Aug. 12, 1985.

Edward C. Abell, Jr., Lafayette, La., Guy Matthews, Houston, Tex., for plaintiff.

Albert B. Kimball, Jr., Royce R. Till, Houston, Tex., and Anthony M. Fazzio, Lafayette, La., for defendants.

## MEMORANDUM RULING

DUHE, District Judge.

Presently before the Court is defendant Harold Davenport's motion pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss plaintiff's third cause of action in its second amended complaint. In this

cause of action the plaintiff, Houston Oil and Minerals, Inc. ("HOMC") alleges that Davenport and other defendants tortiously induced its employee Lilly to breach an agreement not to disclose trade secrets and certain confidential and proprietary information. Movant Davenport argues that no such cause of action exists under Louisiana law, and that while such a cause of action is actionable in Texas, no such underlying agreement existed.

## I. LOUISIANA LAW

In *D'Antoni v. D'Antoni*, 432 So.2d 926 (La.App. 4th Cir.1983), the plaintiffs contended (as does the plaintiff in the instant case) that under La.Civil Code Art. 2324 the defendants were liable for their inducement of a third party to breach its contract with plaintiff. Article 2324 provides that:

> He, who causes another person to do an unlawful act, or assists, or encourages in the commission of it, is answerable in solido, with that person, for the damages caused by such act.

In *D'Antoni*, the Court held that "[t]he 'unlawful' act referred to in Art. 2324 means a tort, not a breach of contract," 432 So.2d at 928, and refused to recognize plaintiff's cause of action for inducing a breach of contract. *D'Antoni* exemplifies the rule of the Louisiana jurisprudence. Hence, if Louisiana law governs this question, Davenport's motion is well-taken.

## II. TEXAS LAW

Both parties agree that Texas law does permit a cause of action for the tortious inducement of a contractual breach. What is at issue if Texas law governs is whether there existed an underlying contract between Lilly and Houston Oil and Minerals.

## III. CHOICE OF LAW

Since this action was brought pursuant to 28 U.S.C. § 1338 for patent infringement, there is federal question subject matter jurisdiction. The state law tort claim which is the subject of the instant motion is before the Court by virtue of the pendent jurisdiction doctrine. That is, the state law tort claim and the federal patent infringement claim derive from a common nucleus of operative fact. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

Under the principles enunciated by the Supreme Court in *Erie R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) and its progeny, this Court is bound in diversity actions to apply state substantive law. This action, however, is not one based on diversity. Nevertheless, the *Erie* doctrine of state substantive law governing non-federal claims is still applicable. See, e.g., *First Southern Federal Savings and Loan of Mobile v. First Southern Savings and Loan of Jackson*, 614 F.2d 71, 73 (5th Cir.1980); *Starkenstein v. Merrill Lynch*, 572 F.Supp. 189, 191 (M.D.Fla.1983). Thus, the pendent tort claim will be resolved by the application of state law.

The alleged tort in the instant case occurred in Texas. Not surprisingly, the parties disagree over which state's substantive law is to be applied. This necessitates an examination of the relevant principles of the law of conflicts.

This action was originally brought in the Houston Division of the Southern District of Texas. It was subsequently transferred to this Court pursuant to 28 U.S.C. § 1406(a) (transfer based not on the inconvenience of the original forum but on the impropriety of that forum). In *Ellis v. Great Southwestern Corporation*, 646 F.2d 1099 (5th Cir.1981), the Court held that "... following a section 1406(a) transfer, regardless of which party requested the transfer or the purpose behind the transfer, the transferee court must apply the choice of law rules of the state in which it sits." *Id.* at 1109–10. It is clear, then, that this Court must apply Louisiana conflicts rules to determine the applicable substantive law.

In resolving conflicts of laws in *tort* actions, Louisiana courts apply the "interests analysis" of the *Restatement of Conflicts*, 2d (1971). See, e.g., *Burns v. Holiday Travels, Inc.*, 459 So.2d 666 (La.App. 4th Cir.1984); *Shaw v. Ferguson*, 437 So.2d 319 (La.App. 2d Cir.1983); *Jones v. Ameri-*

*can Fire-Indemnity Insurance Co.*, 442 So.2d 772 (La.App. 2d Cir.1983).

### IV. THE INTERESTS ANALYSIS: LOUISIANA vs. TEXAS

§ 6 of the *Restatement* provides, in pertinent part:

(2) When there is no such [statutory] directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

### § 6(2) Factors

Whatever the needs of the interstate and international system of § 6(2) may be, it doesn't appear to this Court that they weigh in favor of either party.

The second consideration of § 6(2) is the relevant policy of the forum state—Louisiana. As noted earlier, the Louisiana jurisprudence holds that a third party's inducement of an obligor to breach its contract does not give rise to a delictual cause of action. Davenport, citing *NCH Corp. v. Broyles*, 749 F.2d 247 (5th Cir.1985) and *Brinkley & West, Inc. v. Foremost Insurance Company*, 499 F.2d 928 (5th Cir. 1974), argues that the very strong Louisiana policy of protecting job mobility and voiding covenants not to compete requires the application of Louisiana law. This argument fails because what is at issue in the instant motion *is not* a claim that the defendants are liable for having induced Lilly to leave the service of HOMC. Rather, the plaintiff's third cause of action in its second amended complaint is that the defendants induced Lilly to breach his agreement not

to disclose or disseminate proprietary and confidential information seen in the course of his employment at HOMC. There is no Louisiana public policy against such agreements—indeed, Louisiana law *recognizes* and *enforces* covenants not to disseminate proprietary and confidential information. See, e.g., *NCH Corporation*, supra, 749 F.2d at 253. Louisiana law merely doesn't recognize a delictual cause of action for contractual interference.

The third factor for consideration is the policy of Texas and the relative interest of Texas in the determination of this issue. Texas law permits both covenants not to disclose confidential information and tort claims against third parties for contractual interference. The relative interest of Texas in this matter is greater than that of Louisiana, as the covenant was executed in Texas, and its breach was induced there as well.

The fourth § 6 factor is the protection of justified expectations. This Court thinks that a Texas corporation wronged in Texas is justified in expecting that the legal remedies the State of Texas provides will be available to it.

The fifth factor under § 6 is the certainty, predictability and uniformity of result. These certainly augur in favor of the application of Texas law. Certainty, predictability, and uniformity of result are not enhanced if individuals can escape the consequences of their tortitous acts because of federal procedural rules for venue.

The final factor for consideration under § 6 is the ease in the determination and application of the law to be applied. This factor is neutral since there is no real dispute as to what Louisiana and Texas law respectively provide for the instant motion.

§ 145 of the *Restatement* provides:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered. These contacts are to be evaluated according to their relative importance with respect to the particular issue.

### A. The Place of Injury

The place of injury—Lilly's breach of the alleged covenant not to disclose or disseminate confidential information of HOMC—occurred in Texas. This began before Lilly moved to Louisiana.

### B. Place of Conduct Causing the Injury

Davenport, through his offices and activities in Houston and in conjunction with Paul Adair, committed the alleged acts of inducement in Texas.

### C. The Domicile, Residence, and Place of Business of the Parties

Plaintiff HOMC has its principal place of business in Houston. Defendant Adair is a Houston domiciliary, while defendants Lilly and Davenport are Louisiana domiciliaries. At the time of his initial breach of the covenant not to disclose, however, Lilly was a Texas domiciliary.

### D. Place Where the Relationship Between the Parties Is Centered

It is clear that the relationship between HOMC and its employee Lilly was centered in Houston. Lilly then resigned from HOMC and began to work for Davenport and Adair in Houston. At the time of the inducement of Lilly's breach of his covenant not to disclose, the relationship of the parties was centered in Houston.

### CONCLUSION

When the interests analysis of the *Restatement* is applied to the facts at bar, it is apparent to this Court that Texas has far greater interest than Louisiana in the resolution of plaintiff's claim for contractual interference. The injury that plaintiff seeks redress for occurred in Texas, the inducement for that breach occurred in Texas, and all parties save Davenport were Texans at the time of the alleged tort. Davenport participated through his offices, agents, and activities in Texas. Louisiana's only interest in this claim for contractual interference is that Davenport has been a Louisiana domiciliary throughout this affair, and the fact that this Court sits in Louisiana. Accordingly, this Court will apply Texas law.

### V. TEXAS LAW AND THE MERITS OF DAVENPORT'S MOTION

As noted hereinabove, both parties agree that Texas law permits a cause of action for the inducement of the breach of an obligation. Davenport, however, contends the document signed by Lilly setting forth HOMC's trade secret and proprietary information policy was not a contract.

Both parties have made reference to this policy statement signed by Lilly (plaintiff's exhibit "A" to its second amended complaint). The Court finds that Davenport's 12(b)(6) motion has thus been converted into a motion for summary judgment. See FRCP 12(b); 5 Wright & Miller, *Federal Practice and Procedure* § 1366.

The Fifth Circuit recently admonished that:

In a ruling on a motion for summary judgment, 'the court must indulge every *reasonable* inference from those facts in favor of the party opposing the motion.' (citation omitted) A granting of summary judgment is appropriate only where it appears from the pleadings, depositions, admissions, answers to interrogatories, and affidavits—considered in the light most favorable to the opposing party—that there is 'no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' (citation omitted) Any doubt as to the existence of a material fact is to be resolved against the moving party. *Al-*

*day v. Patterson Truck Line, Inc.,* 750 F.2d 375, 377 (5th Cir.1985). (emphasis in the original)

In this Court's mind, there does exist a very real question of fact as to whether the HOMC policy statement signed by Lilly constituted a contract. Thus, the motion of Davenport must be and is therefore denied.

## ON MOTIONS FOR REHEARING AND RECONSIDERATION

On May 3, 1985, this Court ruled on a motion by defendant, Paul Adair, a Texas resident, to dismiss all claims against him in this matter for lack of subject-matter jurisdiction, or alternatively, improper venue. The motion was denied on the grounds that Adair was the alter ego of SEEC, Inc., a purported Louisiana Corporation, and that accordingly as a partner of a Louisiana business proprietorship Adair had availed himself of the laws of Louisiana— and thus the jurisdiction of this Court.

Adair and co-defendant Harold Davenport now move to reconsider the finding that Adair is the alter ego of SEEC, Inc., and Adair further reurges his motion to dismiss. Adair cites additional facts on the issue of under-capitalization and the co-mingling of funds, while Davenport addresses the issue of the disregard of corporate formalities.

### A.
### Undercapitalization/Co-Mingling of Funds

■ On June 29, 1981, SEEC commenced operations as a Louisiana business proprietorship. On that date Adair made a capital contribution of $50,000. On March 31, 1982, Robert Lilly made a capital contribution of $40,000. With singular irony, SEEC was incorporated under the laws of Louisiana the next day—April Fool's Day.

April Fool's Day was also the day that Davenport paid with personal funds a $205,122.01 carryover debt of SEEC's. There is no evidence of any debt instrument issued by SEEC to Davenport for this payment. Some three months later Allied Bank extended a $300,000 credit line to SEEC, Inc., and out of this Davenport was repaid $155,122.01. The $50,000 difference between this and the earlier SEEC debt

that Davenport paid is purported to be his capital contribution.

SEEC could not pay this $300,000 note and its continuing operating expenses. On June 10, 1984, Lilly, Adair and Davenport executed a $600,000 note payable to the Allied Bank. This $600,000 was used to pay off the earlier $300,000 note to Allied and to permit SEEC to continue to meet its operating expenses. It is illuminating that Messrs. Lilly, Adair, and Davenport were the principal makers of this note—and not merely the guarantors of a note made by SEEC. Furthermore, there is no evidence of any debt instrument(s) issued by SEEC to Lilly, Adair, and Davenport for this transaction.

Thereafter, on October 22, 1984, Adair and Davenport each "loaned" SEEC $375,000. Neither was issued a debt instrument. Indeed, at his January 17, 1985 deposition Adair testified that *"nothing"* was given to him for the $375,000 "loan." It was only after this disturbingly frank testimony, on January 29, that a SEEC promissory note payable to Adair was executed. Davenport asserts in an affidavit that the "press of business" prevented an earlier execution of this note. This "press of business" must have only partially relented, since there is still no evidence of any SEEC debt instrument issued to Davenport for his $375,000 "loan."

Even more revealing was the purpose of the $750,000 "loan" from Davenport and Adair to SEEC. SEEC turned around and used the bulk of this money to pay off the $600,000 debt of Davenport, Adair and Lilly to the Allied Bank (which as observed above was a *principal* debt). The remainder was presumably used for operating expenses.

Finally, there is evidence that Adair's Red Adair Company paid $3,878.72 for SEEC personnel to travel to Venezula on July 13, 1984. No SEEC debt instruments were issued for this expense.

From the foregoing it is obvious that there has been a pattern of co-mingling of the corporate funds of SEEC with that of the personal funds of Davenport, Adair,

and Lilly, as well as another corporation owned by Adair. This co-mingling has taken place at least in part due to the undercapitalization of SEEC. At any rate, this Court is satisfied that the co-mingling of personal and corporate funds is standing alone sufficient to have warranted the piercing of SEEC's corporate veil.

### B. Self-Dealing

 In 1983 Davenport advanced $100,-000 to SEEC, but a debt instrument was not issued to him because it would have been disadvantagous for his personal tax situation. This is a classic case of self-dealing by an officer and shareholder of a corporation which further supports this Court's finding that SEEC, Inc., was a sham corporation.

### C. Adherence to Corporate Formalities

In his deposition testimony Adair testified that he didn't know if there had been regular director's meetings. Indeed, he testified he couldn't remember if there had ever been a director's meeting. He testified that he didn't know if he was a director, and that he thought he *might* be an officer (vice-president). But he qualified this by declaring he was not a functional vice-president. And in an affidavit supporting his original motion, Adair testified. "I am an investor in SEEC, Inc., and have not taken an active role in the business of SEEC, Inc." This Court concluded these statements revealed a fatal disregard for corporate formalities.

Now, however, Adair seems to have concluded that he distanced himself too far from SEEC. In his motion for rehearing Adair adopted the arguments of Davenport on the issue of adherence to corporate formalities. Davenport, in his motion to reconsider, responded to this Court's ruling by attaching copies of minutes of directors' meetings on November 1, 1984; June 4, 1984; November 1, 1983; and November 2, 1982; and shareholders' meetings on November 1, 1984; November 1, 1983; and November 2, 1982. Paul Adair was purportedly present at all of these meetings.

Given the conflict between the sworn deposition and affidavit testimony of Adair

and the uncertified minutes of meetings, this court has little difficulty in giving more credence to the former. The original finding, then, of a disregard of corporate formalities is reaffirmed. This reaffirmation is unnecessary, however, to reach the result the Court does today, since the finding of co-mingling of corporate and personal funds was sufficient standing alone to pierce the corporate veil of SEEC.

### CONCLUSION

 Since SEEC, Inc., existed in reality as the alter ego of Adair, Davenport and Lilly, this Court's previous decision to pierce the corporate veil of SEEC and find Red Adair as a proprietor of a Louisiana business proprietorship was sound. As such, Adair has purposely availed himself of the laws of Louisiana and is thus subject to this Court's jurisdiction. Accordingly, the motions for rehearing by Adair and reconsideration by Davenport are hereby denied.